### CENTRAL R. R. OF NEW JERSEY v. NEW YORK CENT. R. CO.

#### (District Court, E. D. New York.    December 21, 1918.)

WHARVES ⬥⟿20(1, 5)—WHARFINGER—DUTY OF.

Respondent *held* at fault for the sinking of a car float at a float bridge; it appearing that respondent's conductor, in charge of a switching engine which should have unloaded cars on the float, left and began other work after moving the cars, so that the float was thrown out of equilibrium, while the floatman was not guilty of negligence.

In Admiralty. Libel by the Central Railroad of New Jersey against the New York Central Railroad Company. Decree for libelant.

Macklin, Brown, Purdy & Van Wyck, of New York City (William F. Purdy, of New York City, of counsel), for libelant.

Alexander S. Lyman and William Mann, both of New York City, for respondent.

CHATFIELD, District Judge. Float 29, on September 2, 1917, was taken by the tug Jersey Central from Jersey City to the float bridges at Sixty-Eighth street, North River, arriving there at about 9:50 p. m. On the way another float had been taken in tow and left at Weehawken, and the Jersey Central had stopped at Fifty-Ninth street for some time, as the float bridges at Sixty-Eighth street were in use. An attempt was made to place the float at the middle float bridge, but this was too high, and so the float was pulled out and put in at the southerly float bridge, where it was fastened by four toggles, two lines to the drums, two lines to cleats, one line to the rack, and a breast line. The Jersey Central then left, and the work of unloading was not begun until 1:30, when an engine with two pulling cars started to draw the loaded freight cars from the float. One of the pulling cars broke loose during the operation, but this seems to have had nothing to do with the later occurrences. It appears that the float had three cars upon the middle track, four upon the port or northerly track, and five upon the starboard or southerly track. The engine succeeded in taking from the float but one car, as the tide had then fallen so that the slope of the bridge made it impossible to pull the cars up, for the couplings unfastened when the cars struck the slope.

---

⬥⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The engine, then, according to the libelant's witnesses, left the other cars at the toggle end of the float, without shifting either the port or starboard lines of cars back to the middle, so as to restore balance.

The testimony shows that before leaving Jersey City the captain sounded and found 8 or 9 inches of water. The vessel had been pumped by a tug three days before, which operation could reduce the water to between 6 and 7 inches before the pump sucked. Further pumping by tug would not be resorted to until some 14 or 15 inches of water had collected. Evidently the result of leaving the tug moored to the float bridge, with the loaded cars toward the forward or toggle end, caused the water in the float to settle at that end, and thus gradually to increase the strain of the extra load. In addition, it appears by a preponderance of evidence that one car had been withdrawn from the port side, leaving but three upon that side to five upon the starboard. This caused some list to starboard, with the result that the starboard forward corner was down, giving a twist to the entire boat. Evidently the seams were thus opened, and after a time the accumulation of water was sufficient to force out (by the strain resulting from suspension to the float bridge) two of the planks, which, after the float was placed upon dry dock, were found loose, in such a manner as to show that they had been forced away from their proper position before the vessel sank.

Dispute arises as to the conversation between the conductor of the switching train and the floatman, when the engine left to do other work after failing to pull the cars up the slope. The conductor admits that it would have been possible to have removed the cars one at a time by the use of a cable, and that he did not attempt this because he had other work to do, but states that the floatman told him that the float had been leaking before leaving Jersey City and that it had taken in a lot of water, which caused it to list. An attempt to corroborate this testimony was made by a former employé of the Central Railroad of New Jersey, who testifies that the boat was listed badly to starboard while crossing the river, and that he sounded and found considerable water on the way over. The testimony of the other witnesses shows that this man was not upon the float in question, but had been upon the one which was left at Weehawken, and his attention was not called to the matter until the following day, when he heard of the accident, so that his testimony is not convincing, particularly in view of his manner of testifying and his certainty that this float is over 30 years old, as opposed to the definite testimony that she was built 14 years ago.

But the testimony of the conductor is made improbable by the very circumstances of the case. It is admitted that the floatman had no means of pumping the float, and that if pumping was needed a tug had to be called therefor. If the conductor knew that the float was leaking to such an extent as to have acquired a list from the presence of the water, and not from the extra weight of the cars on the starboard forward corner, and if the amount of water in the float was such as to be a probable source of danger, it was the duty of the men in charge of the float bridges to remove the freight cars, so as to avoid undue straining of the boat, or, if the convenience of their work required

delay, to see that the accumulated water was removed by summoning a tug to do the pumping. Even careful watching of the condition of the float might not have avoided the accident, if the presence of this water forced out two planks, and thus caused a sudden inrush of a considerable quantity of water. The condition of the float was in fact discovered by one of the attendants at the float bridges, who testifies that the floatman was in his cabin asleep. The floatman contradicts this, and states that he was around the float most of the time. But, as the floatman could not tell when the engine would return to remove the cars, and if the condition of the float was such that the conductor in charge of the train saw fit to go about other work rather than to remove the cars, or restore the equilibrium of the float, it cannot be held as negligence on the part of the floatman to have failed to sound an alarm, or to apprehend that the float would be left for such a length of time that damage would result. The floatman denies the conversation attributed to him, as to the leaky condition of the boat, and testifies, on the other hand, that the attention of the conductor was called to the twist upon the float by a brakeman, and that the conductor replied that the float was all right.

Of the two stories, that of the floatman is much more probable, for, as has been said, it would be culpable on the part of the conductor to leave the float, unless he thought it was all right, and there would have been difficulty in bridging the float if it had been then badly listed. This accident, evidently, was the result of the usual assumption that extraordinary injury is not apt to occur, and to the casual indifference to possible dangers which is exhibited by workmen in the ordinary performance of their duties.

The New York Central Railroad Company should be held responsible for the situation which resulted and the damage which occurred.